[Cite as *State v. Waver*, 2016-Ohio-5092.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


STATE OF OHIO,                                          :

    Plaintiff-Appellee,                          :                    CASE NO.   CA2015-08-155

    - vs -                                       :                    O P I N I O N
                                                     7/25/2016

                                                 :

KHALEIM S. WAVER,                                      :

    Defendant-Appellant.                         :


CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2014-10-1512


Michael T. Gmoser, Butler County Prosecuting Attorney, Michael Greer, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for plaintiff-appellee

John T. Willard, P.O. Box 35, Hamilton, Ohio 45012, for defendant-appellant


**RINGLAND, J.**

{¶ 1}   Defendant-appellant, Khaleim S. Waver, appeals from the judgment of the Butler County Court of Common Pleas, finding him guilty of trafficking in heroin, possession of heroin, and engaging in a pattern of corrupt activity, and sentencing him to an aggregate, mandatory term of 30 years in prison.  For the reasons that follow, we affirm the judgment of the trial court.

{¶ 2}   In 2014, allegations surfaced that appellant, along with his sister, NaKeisha

Waver-Elliott ("Keisha"), William Lindsay, Adam Weber, and Weber's girlfriend, Shana Panetta, ran a heroin trafficking operation in Hamilton, Ohio. Appellant and Lindsay would bring bulk heroin to the apartment of Panetta and Weber where appellant, Lindsay, and Weber would break down the bulk heroin into powder and put it into capsules, a process referred to as "capping" the heroin. The group would generally "cap" 200 to 300 doses of heroin at a time and then store the doses in Panetta's and Weber's apartment. Appellant and Lindsay employed three "drug runners" to sell the drugs to buyers. Weber, acting pursuant to appellant's instructions, was to distribute the heroin capsules to the drug runners who would then sell the drugs to buyers. For two to three months, Weber, and sometimes Panetta, handed out to appellant's drug-runners bags containing 50 to 100 capsules of heroin.

{¶ 3} The heroin trafficking operation came to light when a person referred to at trial as "Confidential Informant 992" told the Butler Undercover Regional Narcotics Unit ("BURN Unit") about appellant's drug activities and offered to work with the police. With CI 992's assistance, the BURN Unit investigated two apartments in the apartment complex at 692 Gordon Smith Blvd.: Apt. # 4, which was the home of appellant and Lindsay, and the apartment directly above it, Apt. # 8, which was the home of Panetta and Weber. The police also investigated the residence at 321 Washington Street where Keisha lived.

{¶ 4} As part of their investigation, the police arranged for CI 992 to make several controlled buys from appellant and his co-conspirators at their residences. Agent Herring would later explain at trial that the drug operation worked by having appellant or his co-conspirators "front" a person who agreed to sell heroin for them with a certain amount of the drug, meaning that appellant or his co-conspirators would give the person a certain amount of heroin without expectation of immediate payment. After the person sold the heroin, the person would return to the residence of appellant or one of his co-conspirators and "drop off"

money to pay for the heroin and the person would then receive more heroin to sell.

{¶ 5} During the controlled buys or "money drops," CI 992 was accompanied by either Agent Herring or Officer Chelsea LaRue,[1] both of whom worked undercover during the controlled buys. Before each controlled buy or money drop, Agent Herring or Officer LaRue gave CI 992 recorded drug fund money or "marked money" to make the controlled buys or money drops, and outfitted CI 992 with a small, audio and visual recorder. Before each controlled buy or money drop, an officer would pat-down CI 992 and search CI 992's vehicle for contraband. After each controlled buy, Agent Herring or Officer LaRue and CI 992 would travel to another location, and Agent Herring or Officer LaRue would again search CI 992 for money and contraband. Agent Herring also would take possession of the recording device after each controlled buy or money drop, and then download the recording onto his laptop computer at the police station.

{¶ 6} On August 18, 2014, at 7:58 p.m., CI 992, who was accompanied by Officer LaRue, drove to Keisha's residence. Agent Herring was nearby with the surveillance team. CI 992 paid Lindsay $400 for heroin that CI 992 had received from Keisha the day before. Lindsay then provided CI 992 with another baggy of heroin capsules.

{¶ 7} On August 19, 2014, at 3:30 p.m., CI 992, accompanied by Agent Herring, returned to Keisha's residence and paid Keisha $500 for the heroin Lindsay had provided to CI 992 the day before. Keisha directed CI 992 to go to Weber's apartment, and told CI 992 that she would call ahead to Lindsay regarding the sale and Lindsay would tell Weber what amount of heroin to give CI 992. Keisha also told CI 992 that if CI 992 saw a BMW outside appellant's apartment, CI 992 should stop at appellant's apartment and appellant would tell her what to get. At 4:47 p.m., CI 992 met appellant at his apartment. Appellant told CI 992 to go upstairs to Weber's and Panetta's apartment where CI 992 would receive 100 capsules of

---

1. Officer LaRue is with the Village of Woodlawn Police Department in Hamilton County, Ohio.

heroin. CI 992 went upstairs to Panetta's and Weber's apartment where she met Panetta. Panetta left momentarily and returned with a bag containing heroin capsules, which she gave to CI 992.

{¶ 8} On August 20, 2014, at 9:54 p.m., CI 992, accompanied by Officer LaRue, went to appellant's apartment. Agent Herring was again nearby with a surveillance team. CI 992 paid appellant for the heroin she had received the day before. Appellant made a phone call to an unidentified person and told the person "to put something together" for CI 992. Appellant also told the unidentified person there should be "ten and a half in the bag," and ordered the other person to "take five out of the bag." Agent Herring later testified at trial that based on his experience and training in narcotics, appellant's order to "take five out of the bag" meant "to cap up 5 grams," which would produce 50 capsules of heroin.[2]

{¶ 9} On August 22, search warrants were executed simultaneously on all three residences. At appellant's residence, appellant, his girlfriend, and two children were present. Police found $3,900 in cash in appellant's bedroom, $500 of which was the marked money that had been provided to CI 992 for use in the controlled buys. In Panetta's and Weber's apartment, the police found 276 capsules of heroin that were packaged in multiple bags, along with a bag containing unpackaged heroin powder. The heroin was stored at a location in the apartment that was 30-40 feet away from appellant's apartment where the police had found two children.

{¶ 10} Appellant and his four co-conspirators were charged in a 26-count indictment. Appellant was specifically indicted on five drug-related counts: trafficking in heroin, a second-degree felony, in violation of R.C. 2925.03(A)(1) (Count 17); possession of heroin, a second-degree felony, in violation of R.C. 2925.11 (Count 18); trafficking in heroin, a first-degree felony, in violation of R.C. 2925.03(A)(2) (Count 19); possession of heroin, a second-

---

2. CI 992 did not receive any heroin from appellant at the time she made the money drop to him on August 20.

degree felony, in violation of R.C. 2929.11 (Count 20); and engaging in a pattern of corrupt activity, a first-degree felony, in violation of R.C. 2923.32(A)(1) (Count 21). Counts 19, 20, and 21 each contained the same four specifications alleging the $3,900 in cash found inside appellant's residence and three automobiles (a 2003 BMW, a 2001 GMC Yukon, and a 1997 Honda) owned by appellant are "proceeds of illegal activity and subject to forfeiture" pursuant to R.C. 2941.1417 and 2981.04.

{¶ 11} At appellant's trial, the state presented a number of witnesses including Panetta, Agent Herring, and Officer LaRue, who testified to the facts related above. The state did not disclose the identity of CI 992 or use CI 992 as a witness at trial. The jury convicted appellant of all five of the principal charges against him.

{¶ 12} The trial court merged appellant's conviction on Count 18 with his conviction on Count 17, upon determining the offenses charged in those counts were allied offenses of similar import, and merged appellant's conviction on Count 20 with his conviction on Count 19 for the same reason. The trial court sentenced appellant to an aggregate 30-year mandatory prison term for his convictions on Counts 17, 19, and 21. Appellant was tried separately by the bench on the criminal forfeiture specifications attached to Counts 19 and 21, after appellant waived his right to a jury trial on the specifications and pled no contest to them. The trial court found appellant guilty of the specifications and issued forfeiture orders regarding appellant's BMW, GMC Yukon, and Honda, and his interest in the $3,900 in cash seized by police at the time of his arrest.

{¶ 13} Appellant now appeals and assigns the following as error:

{¶ 14} Assignment of Error No. 1:

{¶ 15} IT WAS ERROR AND AN ABUSE OF DISCRETION FOR THE COURT TO ADMIT INTO EVIDENCE DVDS THAT ALLEGEDLY WERE RECORDED 8/19 2014 [sic] AND IDENTIFIED AS EXHIBIT #85 AND EXHIBIT 106 THAT WAS ALLEGEDLY

RECORDED 8/20/2014 AS THE SAME WERE HEARSAY AND WERE NOT PROPERLY AUTHENTICATED AS REQUIRED BY OHIO RULES OF EVIDENCE, NOR WERE THE DVDS THE BEST EVIDENCE. SINCE THE CONFIDENTIAL INFORMANT THAT MADE THE VIDEO WAS NEVER DISCLOSED AND DID NOT TESTIFY THE STATEMENTS WERE TESTIMONIAL IN NATURE AND THE APPELLANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO CROSS[-]EXAMINE A KEY WITNESS.

{¶ 16} Assignment of Error No. 2:

{¶ 17} IT WAS ERROR TO ADMIT INTO EVIDENCE EXHIBITS OF ALLEGED MEASURED AMOUNTS OF HEROIN AS THERE WAS NO EXPERT TESTIMONY AS TO HOW MUCH OF THE POWDER WAS HEROIN AND HOW MUCH WAS FILLER AND NOT HEROIN WITHOUT SUCH MEASUREMENT IT WAS IMPOSSIBLE FOR A JURY TO MAKE A FINDING BEYOND REASONABLE DOUBT AS TO HOW MUCH HEROIN WAS IN THE EXHIBITS BY WEIGHT. [SIC]

{¶ 18} Assignment of Error No. 3:

{¶ 19} IT WAS ERROR TO ADMIT THE TESTIMONY OF A CODEFENDANT INTO EVIDENCE OF A CONSPIRACY WITHOUT INDEPENDENT PROOF OF A CONSPIRACY BEING FIRST SHOWN.

{¶ 20} Assignment of Error No. 4:

{¶ 21} THE APPELLANT IN THE INSTANT CASE HAD INEFFECTIVE ASSISTANCE OF COUNSEL.

{¶ 22} Assignment of Error No. 5:

{¶ 23} THE VERDICT IN THE INSTANT CASE WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND LACKED SUFFICIENT ADMISSIBLE EVIDENCE TO SUPPORT A CONVICTION.

{¶ 24} Assignment of Error 6:

{¶ 25} THE ERRORS IN THE INSTANT CASE WERE SO NUMEROUS AND CRITICAL AND CUMULATIVE THAT IT WAS IMPOSSIBLE FOR THE APPELLANT TO GET A FAIR TRIAL.

### Authentication of Videos

{¶ 26} Appellant presents three different arguments in his first assignment of error. He first argues the trial court erred by admitting into evidence the videos of the controlled buys and "money drops" because the videos were not properly authenticated as required by Evid.R. 901. Appellant contends the state's attempt to authenticate the videos through the testimony of the investigating officers was insufficient because "[n]o member of the police department was present when the videos were taken," as "[t]he police were in a car outside the premises and had no view of what transpired outside their sight." Appellant contends the "appropriate person to authenticate the videos was [CI 992] who never was identified and did not testify[,]" and therefore his Sixth Amendment right to cross-examine a key witness against him was violated. We disagree with this argument.

{¶ 27} Generally, a "trial court's decision to admit or exclude evidence will not be reversed by a reviewing court absent an abuse of discretion." *State v. Jackson*, 12th Dist. Fayette No. CA2011-01-001, 2011-Ohio-5593, ¶ 16. An abuse of discretion implies that the court's decision was unreasonable, arbitrary, or unconscionable. *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, ¶ 130.

{¶ 28} Evidence Rule 901(A) states that "[t]he requirement of authentication * * * as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." The "threshold requirement for authentication of evidence is low and does not require conclusive proof of authenticity." *State v. Freeze*, 12th Dist. Butler No. CA2011-11-209, 2012-Ohio-5840, ¶ 65, citing *State v. Easter,* 75 Ohio App.3d 22, 25 (4th Dist.1991). Rather, "the state only needs to demonstrate

a 'reasonable likelihood' that the evidence is authentic." *Id.* Either circumstantial evidence or direct evidence may be used to prove the authenticity of evidence. *State v. Vermillion*, 4th Dist. Allen No. 15CA17, 2016-Ohio-1295, ¶ 14. Testimony of a witness with knowledge that the "matter is what it is claimed to be" is sufficient to properly authenticate an item pursuant to Evid.R. 901(A).

{¶ 29} Evid.R. 901(B) contains a nonexclusive list of the means by which a proponent may demonstrate authenticity and states, in pertinent part, as follows:

> (B) Illustrations. By the way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming to the requirements of this rule:
>
> (1) Testimony of witness with knowledge. Testimony that a matter is what it is claimed to be.
>
> * * *
>
> (9) Process or system. Evidence describing a process or system used to produce a result and showing that the process or system produces an accurate result.

{¶ 30} In *Midland Steel Prods. Co. v. U.A.W. Local 486*, 61 Ohio St.3d 121, 129-130 (1991), the court stated, in pertinent part, as follows:

> Under Evid.R. 901(A), Midland Steel could introduce the videotapes into evidence only upon a sufficient showing that they accurately depicted appellants' misconduct. In *Fisher v. State* (1982), 7 Ark.App. 1, 5-6, 643 S.W.2d 571, 573-574, the court summarized two of the methods for authenticating photographic evidence like videotapes:
> "The admissibility of photographic evidence is based on two different theories. One theory is the 'pictorial testimony' theory. Under this theory, the photographic evidence is merely illustrative of a witness' testimony and it only becomes admissible when a sponsoring witness can testify that it is a fair and accurate representation of the subject matter, based on that witness' personal observation. * * * A second theory under which photographic evidence may be admissible is the 'silent witness' theory. Under that theory, the photographic evidence is a 'silent witness' which speaks for itself, and is substantive evidence of what it portrays independent of a sponsoring witness. * * *"
> (Citations omitted.) *See, also, United States v. Rembert* (C.A.D.C.1988), 863 F.2d 1023.

The Ohio Supreme Court followed its decision in *Midland Steel* in *State v. Pickens*, 141 Ohio St. 3d 462, 2014-Ohio-5445, ¶ 150.

{¶ 31} Here, the videos that appellant claims were not properly authenticated were taken by the audio and visual recording device given to CI 992 before each of the controlled buys and money drops in this case. The videos included the transaction at Keisha's residence on August 18 (Ex. 13), the transaction at Keisha's residence on August 19 (Ex. 16), the transaction at appellant's apartment and Panetta's and Weber's apartment on August 19 (Ex. 17), and the transaction at appellant's apartment on August 20. The state contends that Agent Herring testified that "he had knowledge of all the videos" and that "each video was a fair and accurate depiction." The state asserts this evidence was sufficient to meet "the low threshold for authentication," and therefore there was no need for the state to call CI 992 as a witness to authenticate the videos.

{¶ 32} By asserting that Agent Herring "had knowledge of all the videos" and that each video was a "fair and accurate depiction," the state is essentially arguing that it authenticated all of the videos under the pictorial theory of authentication of photographic evidence, including videos. A review of the evidence shows that while this theory of authentication may be applicable to the videos taken at appellant's apartment and Panetta's and Weber's apartment, it does not appear to apply to the residence of Keisha. Nevertheless, the "silent witness" theory of authentication is applicable to all of the videos admitted into evidence.

{¶ 33} Agent Herring testified that he was familiar with the layout inside 692 Gordon Smith Blvd. and appellant's apartment, and that he "walked in the front door" of Panetta's and Weber's apartment. Agent Herring also testified the video he retrieved from the August 19 transaction was a "true, fair and accurate recording of the incident as it happened[.]" Therefore, Agent Herring's testimony regarding Exhibits 16, 17, and 20, which contained

video recordings of the drug transactions at the apartment of appellant and the nearby apartment of Panetta and Weber, was sufficient to authenticate those videos under the pictorial theory of authentication, since Agent Herring had been at those apartments and thus was able to testify that the videos taken at those apartments were a true, fair and accurate recording of the events shown in those videos.

{¶ 34} As to Exhibit 13, which is the video of the August 18 transaction at Keisha's residence, it is not clear from the record whether Agent Herring was ever inside that residence. Agent Herring testified that he was nearby with the surveillance team when Officer LaRue accompanied CI 992 to Keisha's residence to drop off money and obtain more heroin capsules on August 18. However, Agent Herring did not testify that he ever went inside Keisha's residence, and while Officer LaRue testified that she accompanied CI 992 to Keisha's residence on August 18, Officer LaRue admitted that she did not enter the residence with CI 992, and the state did not ask LaRue to authenticate Exhibit 13. Nevertheless, all of the videos admitted in this case, including Exhibit 13, come within the auspices of Evid.R. 901(B)(8) and the "silent witness" theory of authentication of photographic evidence, including videos.

{¶ 35} In *State v. Munion*, 4th Dist. Scioto No. 12CA3520, 2013-Ohio-3776, narcotics officers were investigating allegations of the production and trafficking of methamphetamine at the residence of Crystal Collier. The officers enlisted the aid of a confidential informant and outfitted him with a video recording device. On his second visit to Collier's residence, the confidential informant stayed at the residence for about an hour and purchased some methamphetamine. The video captured Collier in the residence with the defendant in that case, Troy Munion, and Collier's two juvenile children. The following day, the officers executed a search warrant on Collier's residence and discovered many items used in the production of methamphetamine as well as an amount of methamphetamine. Munion and

Collier were arrested. The confidential informant did not testify at Munion's trial. Instead, the state used the lead detective in the case, Detective Koch, to authenticate the video recorded by the confidential informant. Detective Koch testified that he and two other officers placed a recording device on the confidential informant and watched him enter Collier's residence. Munion was convicted and he appealed, arguing that Detective Koch could not authenticate the video because he was not present inside the residence, and that Collier was the only person who could authenticate the video because the video purportedly showed the inside of her residence. *Id.*

{¶ 36} The Fourth District Court of Appeals rejected Munion's argument. The court first noted the protocol or procedure that Detective Koch and his department used when a confidential informant made a recorded controlled buy, which included searching the confidential informant for contraband before the transaction, outfitting the confidential informant with a recording device, and then once the transaction is completed, searching the confidential informant again for drugs or money, seizing any drugs or money found, and collecting the video recording device. The court noted that at the beginning and end of the video, Detective Koch appeared, stating the time, date and his identity. In disagreeing with Munion's argument that Collier was needed to authenticate the video since the video purportedly showed the inside of her residence where the confidential informant purchased the methamphetamine, the court noted that Detective Koch testified as to the procedure he used in producing the video and that the video is a true and accurate copy. The court determined that "[u]nder the illustrations of Evid.R. 901(B), Detective Koch stands as a witness who can testify as to the authentication of the video the investigation produced" and that the procedure Detective Koch discussed involving the confidential informant "presents the court with the 'process or system' that created the video." *Id.* at 22. Consequently, the court found that Detective Koch's testimony was sufficient to authenticate the video.

**{¶ 37}** We find the case presently before us to be similar to *Munion*. Agent Herring and Officer LaRue testified to the procedures that are used when they have a confidential informant make a controlled buy or money drop and that they used those procedures in this case regarding the transactions that took place on August 18, 19, and 20. These procedures are the same as, or similar to, the procedures used by the police in *Munion*. Agent Herring also testified about the various features of the audio and visual recording device that was provided to CI 992, including the feature that requires a code to be punched into the device to start and stop the recording. Agent Herring testified that such a feature would prevent someone without knowledge of how the device worked with tampering with the recording. Agent Herring also testified that he has used the device about 20 to 30 times, thereby indicating the reliability of the device.

**{¶ 38}** The only clear difference between this case and *Munion* involves the fact that, unlike the lead detective in *Munion*, Agent Herring failed to use the "date" and "time" features on the audio and visual recording device that he gave to CI 992 on the dates of the controlled buys or money drops in this case. Agent Herring explained at trial that at the time this case occurred, the device was new and he was not fully familiar with all of the features of the device. However, Agent Herring testified that he did write down in his notes the dates and times of the controlled buys. The absence of a date and time on the video recordings, alone, does not preclude a finding that the video recordings were properly authenticated, given the well-established principle that the threshold for authentication is low and does not require conclusive evidence. *Freeze*, 2012-Ohio-5840 at ¶ 65. Therefore, we conclude the state presented sufficient evidence to meet the "low threshold" necessary for authenticating the videos of the controlled buys and money drops in this case.

**Right to Confrontation**

**{¶ 39}** Appellant also argues his right to confront the witnesses against him was

violated because the videos the trial court admitted contained hearsay as they contained out-of-court statements made by CI 992 who was never identified and did not appear or testify at trial. However, the Confrontation Clause bars only the admission of "testimonial" hearsay. *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354 (2004). "[S]tatements made unwittingly to a Government informant" have been held to be "clearly nontestimonial." *Davis v. Washington*, 547 U.S. 813, 825, 126 S.Ct. 2266 (2006), citing *Bourjaily v. United States*, 483 U.S. 171, 181-184, 107 S.Ct. 2775 (1987). See also *Ohio v. Clark*, __ U.S. __, 135 S.Ct. 2173, 2182 (2015) ("Statements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers."). *See also State v. Ali*, 2d Dist. Clark No. 2014 CA 59, 2015-Ohio-1472, ¶ 25. In light of this authority, we find that CI 992's out-of-court statements on the videos that were admitted into evidence at appellant's trial were not "testimonial" statements under *Crawford*, and therefore, the admission of these statements did not violate appellant's confrontation rights.

### Best Evidence

**{¶ 40}** Appellant also alleges the videos were edited by police, and after editing, transferred to DVDs, and further asserts that Evid.R. 1002 "requires that the original [videos] be admitted." He also claims, without citing any evidence in support, that the videos admitted into evidence at his trial were "admittedly edited copies of the original videos[,]" and argues the copies of the videos were not the "best evidence" of the transactions, as required by Evid.R. 1002. However, there is no evidence in the record that the videos were edited, and Evid.R. 1003 permits copies of videos to be admitted into evidence.

**{¶ 41}** Appellant contends the state gave no "cogent" reason for not admitting the original videos and that "inconvenience for the prosecution is not a valid reason to ignore Evidence Rule 1102 [sic]." However, Evid.R. 1003 provides that a copy or duplicate is

admissible without requiring the proponent to show that he cannot produce the original. Therefore, Evid.R. 1003 essentially provides that "duplicates are presumptively the equal of originals[,]" and "the burden is on the opponent of the duplicate to establish conditions requiring the use of the original." *Weissenberger's Ohio Evidence Treatise*, Section 1003.1 (2015). Here, appellant has failed to provide any cogent reason for requiring use of the original videos.

{¶ 42} In light of the foregoing, appellant's first assignment of error is overruled.

**Determining Weight of Controlled Substances with "Filler."**

{¶ 43} In his second assignment of error, appellant asserts the trial court erred by admitting into evidence exhibits that show the amounts of heroin involved, since there was no expert testimony as to how much of the substance was heroin and how much was "filler," i.e., nonheroin and noncontrolled substances, thereby preventing the trier of fact from being able to determine beyond a reasonable doubt how much heroin was involved. However, the statute under which appellant was convicted does not require filler to be separated from the controlled substance, and it is not improper to include filler in the total amount charged. *See* R.C. 2925.03(C)(6) ("if the drug involved in the violation is *heroin or a compound, mixture, preparation, or substance containing heroin*, whoever violates division (A) of this section is guilty of trafficking in heroin"). (Emphasis added.) *See also State v. Smith*, 2d Dist. Greene No. 2010-CA-36, 2011-Ohio-2568, ¶ 6-12 (state was not required to segregate the cocaine from the other ingredients in the substance), citing, among other cases, *State v. Bailey*, Montgomery App. No. 21123, 2005-Ohio-6669, ¶ 8 ("filler" found in controlled substance can be included in determining the controlled substance's weight).

{¶ 44} We find cases like *Smith* and *Bailey* to be persuasive. This court is aware there is authority to the contrary and that this issue is currently before the Ohio Supreme Court. *See State v. Gonzales*, 6th Dist. Wood No. No. WD-13-086, 2015-Ohio-461, *motion*

*to certify allowed*, 143 Ohio St. 3d 1402, 2015-Ohio-2747, and *appeal allowed*, 143 Ohio St. 3d 1403, 2015-Ohio-2747.

{¶ 45} Appellant also contends the trial court erred in allowing Agent Herring to testify that heroin is "a very addictive drug and it has the potential to be very life-threatening due to the compound of mixtures and the unknown amounts of heroin that are sometimes distributed in the compound." Appellant argues "the admission of such evidence" violated Evid.R. 702 (testimony by experts) and Crim.R. 16 (discovery). However, appellant did not object to this portion of Agent Herring's testimony and thus has forfeited all but plain error. *State v. Hiler*, 12th Dist. Butler No. CA2015-05-04, 2015-Ohio-5200, ¶ 11.

{¶ 46} Plain error exists where there is an obvious deviation from a legal rule which affected the defendant's substantial rights, or influenced the outcome of the proceeding. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Therefore, appellant was required to demonstrate a "reasonable probability" that the error resulted in prejudice. Here, the exclusion of Detective Herring's testimony clearly would not have changed the result of these proceedings, since this information is generally well known.

{¶ 47} Appellant also argues the trial court "did not follow the law as set out in R.C. 2925.11(A) and (C 4)," (sic), by which, presumably, he meant 2925.11(C)(*6*), since division (C)(4) involves cocaine while division (C)(6) involves heroin. However, appellant has not provided any explanation as to how the court failed to follow R.C. 2925.11(A), which provides that "[n]o person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog[,]" *or* division (C)(6) of that section, which provides that "[i]f the drug involved in the violation is heroin or a compound, mixture, preparation, or substance containing heroin, whoever violates division (A) of this section is guilty of possession of heroin[,]" and then lists the penalties for the violation, which are dependent upon the amount of heroin involved in the violation. R.C. 2925.11(C)(6)(b)-(f). Instead, it appears that

appellant is simply asking us, once again, to follow the reasoning of the Sixth District Court of Appeals in *Gonzales* at ¶ 38-47, which we have already declined to do. Given the foregoing, appellant's second assignment of error is overruled.

**Evid.R. 801(D)(2)(e) and Independent Proof of a Conspiracy.**

{¶ 48} In his third assignment of error, appellant contends the trial court erred by allowing a co-conspirator to testify without first providing independent proof of the conspiracy, as required by Evid.R. 801(D)(2)(e). We disagree with this argument.

{¶ 49} Evid.R. 801(D)(2)(e) provides that a "statement is not hearsay if * * * [t]he statement is offered against a party and is * * * a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy." *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, ¶ 100. The proponent of the evidence need only to establish a prima facie case of conspiracy by admissible evidence that raises a presumption or inference of conspiracy. *State v. Eacholes*, 12th Dist. Butler No. CA2013-11-195, 2014-Ohio-3993, ¶ 19.

{¶ 50} In this case, appellant argues that a conspiracy was not established by independent evidence before Panetta, a co-conspirator, testified. However, in his brief, appellant fails to specifically argue what hearsay statements Panetta testified to at trial that required independent proof of a conspiracy in order to be admissible pursuant to Evid.R. 801(D)(2)(e).

{¶ 51} We first note that, like any other witness, Panetta's testimony regarding her direct observations and actions was admissible, regardless of her status as a co-conspirator. See *State v. Mauro*, 2d Dist. Montgomery No. 9499, 1987 WL 14254, * 2 (July 14, 1987). Additionally, Panetta could testify to any statement made directly to her by appellant, as an admission by a party-opponent pursuant to Evid.R. 801(D)(2)(a).

{¶ 52} Moreover, even if independent evidence of a conspiracy was not presented at

the time Panetta testified to statements that would otherwise be hearsay, proof of a conspiracy was subsequently offered by the state, and "[t]he premature admission of a statement of a co-conspirator under Evid.R. 801(D)(2)(e) is harmless error where the proponent subsequently supplies the requisite independent proof." *Eacholes* at ¶ 18, 20; *See also State v. Carter*, 72 Ohio St.3d 545, 500 (1995). In light of the foregoing, appellant's third assignment of error is overruled.

**Ineffective Assistance**

{¶ 53} In his fourth assignment of error, appellant argues his trial counsel provided him with ineffective assistance of counsel.

{¶ 54} To prevail on an ineffective-assistance claim, a defendant must show that his counsel's performance was deficient in that it fell below "an objective standard of reasonableness" and that he was prejudiced by that deficient performance in that there exists a "reasonable probability" that, but for counsel's deficient performance, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the proceedings. *Id*. at 694.

{¶ 55} Appellant first argues his trial counsel's performance was deficient because counsel "made no attempt" to compel disclosure of CI 992's identity and thus effectively denied him the right to confront all of the witnesses against him. However, CI 992 never testified against appellant, and none of CI 992's out-of-court statements was offered for the truth of the matter asserted. As a result, appellant was not entitled to confront CI 992, and thus his trial counsel's performance cannot be deemed deficient for this reason.

{¶ 56} Appellant next argues his trial counsel's performance was deficient because counsel failed to object to Panetta's testimony and failed to move to strike her testimony on the basis that Panetta was an alleged co-conspirator and no independent foundation had

been laid to show the existence of a conspiracy prior to her testimony. However, appellant's trial counsel did raise an objection to Panetta's testimony, and the trial court overruled it. Further, the trial court did not err in overruling the objection for the reasons set forth in our response to appellant's third assignment of error. Thus, appellant's trial counsel's performance was not deficient on this basis.

{¶ 57} Appellant faults his trial counsel for not objecting to the admission of the state's expert reports on the substances seized in this case. However, there is no evidence in the record to show, nor any explanation offered by appellant to explain, how the decision of appellant's trial counsel not to object to the admission of these reports constituted a performance error or how appellant was prejudiced by this alleged performance error.

{¶ 58} Appellant contends his trial counsel's performance was deficient because he failed to object to a brief portion of Agent Herring's testimony that, appellant alleges, was hearsay. Appellant is referring to Agent Herring's testimony that his department had received information regarding appellant in the past, CI 992 approached him and expressed a desire to be a confidential informant, and CI 992 had information on appellant and his involvement in trafficking heroin. However, this testimony arguably was not hearsay, since it does not appear to have been admitted to prove the truth of the matter asserted, but merely to provide context regarding why the police began investigating appellant. Additionally, even if the testimony constituted hearsay, appellant has, again, failed to show how he was prejudiced by this testimony, because there is no reasonable probability that the outcome of his trial would have been different had his trial counsel objected to this testimony.

{¶ 59} Lastly, appellant points out that he objected to his trial counsel's representation of him during the trial and asked the trial court to postpone the trial so he could obtain new counsel. Appellant also contends his trial counsel refused to call a necessary witness on his behalf, thereby effectively depriving him of his Sixth Amendment right to call witnesses on his

behalf.

{¶ 60} At the beginning of the second day of the trial, appellant informed the trial court he no longer wanted his counsel to represent him, and asked the trial court to postpone the trial so he could obtain a new lawyer. He claimed two of the state's witnesses, presumably, Agent Herring and Officer LaRue, had committed perjury. He also claimed that the videos of the controlled buys and money drops were presented "backwards" and "out of order" and that this "was the whole problem with the authentication." He also claimed that he wanted his trial counsel to call Weber as a witness to testify regarding the actual order in which the videos were recorded. Appellant asked the trial court to declare a mistrial on the grounds of prosecutorial misconduct and misconduct by the state's witnesses on the basis of "tampering with the dates on the videos[,]" which, appellant claimed, enabled the state to show the videos out of order and in a light most favorable to the state.

{¶ 61} The trial court refused appellant's request to postpone the trial. However, the trial court told appellant that he would be permitted to substitute his current trial counsel with a different attorney of his choosing if the new attorney showed up in time. The trial court also told appellant that he would be permitted to call Weber to the stand if he chose to do so. The prosecutor stated that Weber was in the Butler County Jail. Appellant then informed the trial court that he wanted "to go on." The trial court stated it would interpret appellant's statement as a withdrawal of his request to dismiss his current counsel, which appellant did not dispute. Appellant never called Weber as a witness at trial.

{¶ 62} There is nothing in the record to show that the videos of the controlled buys and money drops were presented out of order, as appellant contends. There is nothing in the record to show that appellant was prohibited from calling Weber as a witness during trial or that, if Weber had been called as a witness, he would have testified that the videos were presented out of order. Thus, appellant has failed to prove either the performance prong or

the prejudice prong of the *Strickland* standard as to this aspect of his ineffective assistance claim.

{¶ 63} In light of the foregoing, appellant's fourth assignment of error is overruled.

**Sufficiency and Manifest Weight of the Evidence, Cumulative Error**

{¶ 64} In his fifth assignment of error, appellant contends that a review of the entire record indicates there is insufficient admissible evidence to support a conviction on any of the counts against him, including engaging in a pattern of corrupt activity, and the convictions were against the manifest weight of the evidence. However, our review of the record shows the state presented ample evidence to support each element of each offense and accompanying specification with which appellant was charged and that appellant's convictions on those charges and specifications were not against the manifest weight of the evidence. Consequently, appellant's fifth assignment of error is overruled.

{¶ 65} In his sixth assignment of error, appellant alleges the errors committed at his trial were "so numerous and critical and cumulative" that it was "impossible" for him to receive a fair trial. However, appellant has failed to identify any reversible error at his trial, and therefore the cumulative error doctrine has no application to this case. Accordingly, appellant's sixth assignment of error is overruled.

{¶ 66} Judgment affirmed.

S. POWELL, P.J., and HENDRICKSON, J., concur.